| UNITED STATES DISTRICT COURT | SOUTHERN DISTRICT OF TEXAS |
|---|---|

| | | |
|---|---|---|
| Jeffrey D. Henning, | § § | |
| Plaintiff, | § § | |
| versus | § § | Civil Action H-09-1254 |
| Tecsis Tecnologia e Sistemas Avancados Ltda., | § § § § | |
| Defendants. | § | |

# Findings of Fact and Conclusions of Law

1. *Parties.*

Jeffrey D. Henning is an accomplished executive in the industrial base of the wind-energy business. He earned his bachelor's degree from the United States Coast Guard Academy and a master's degree in business administration from Pennsylvania State University. From 2001 to 2005, he worked for General Electric. While there, Henning was a (a) plant finance leader for the manufacture and assembly of wind turbine components, including blades, (b) composite-material sourcing manager responsible for blade procurement and logistics; and (c) materials resource planner for the assembly of several products, including wind turbine components. During his tenure at GE, Henning acquired a complex, profound understanding of the wind-energy industry.

Tecsis Tecnologia e Sistemas Avancados, Ltda., is a company that manufactures wind turbine blades and related products. From its base in Sao Paulo, Brazil, it sells those products throughout the world. In North America, GE is Tecsis's largest customer and one of the world's leading buyers of wind turbines.

2. *Texas.*

Texas has jurisdiction over Tecsis because it does and has done business here. It has both specific and general jurisdiction. This action is a dispute about an agreement to be performed in the United States – working on a proposal to sell GE turbine blades in America and establishing an office in America.

Tecsis had to have had a clear anticipation that Henning's and its work was likely – reasonably – going to be in Texas. It shipped its blades to the Port of Houston – the nation's largest by tonnage. Before this contract, most of the products it sold into the United States were delivered through the Port of Houston. Over the years, Tecsis has sent technicians from Brazil to Houston to repair its products. It has had large crews working for long times in the mid-west.

Whatever its original concept of where in America that Henning might work, Tecsis has known since the first weeks of the contract that Henning was establishing its subsidiary in Houston. Tecsis has taken the benefits of operating in Houston for years.

Separate from the contract itself but related to Tecsis in Texas, since at least 2007, Tecsis has had an employee in Houston for business development. This man has also worked for its subsidiary, Wind Composite Services Group, LLC – called WindCom. While in Houston, he works directly for Tecsis to develop its businesses that are distinct from WindCom.

Early in this case, Tecsis said that it did no business in Texas, but those statements were simply false. The reality was that Tecsis was soliciting business through an employee in Texas at the time the declaration was made, and it continues to do so. When confronted at trial, Tecsis's chief executive could only manage evasion.

At least part of the agreement at issue was performed in Texas. As part of his agreement with Tecsis, Henning established WindCom in Texas as a subsidiary of Tecsis to assist him in all of his work for Tecsis directly and through WindCom. Further, WindCom was an integral part of Tecsis, not a distinct juridical entity. Its workers, funds, and offices were directed from Sao Paulo. WindCom used Tecsis workers for ordinary operations in Texas. Tecsis did not independently capitalize WindCom; all revenues WindCom earned were sent to Tecsis. Tecsis hired and supervised WindCom's executive. No practical or legally effectual distinctions have ever existed, and Tecsis confirmed this in August of 2007 when it told Henning, "Tecsis and WindCom is [sic] one company."

3.   *Negotiations.*

Knowing that its contract with GE would soon expire and hoping to secure another one, Tecsis began in July of 2005 to explore a consulting relationship with Henning. Henning's background with GE made him especially attractive to Tecsis. Allan de Azevado Barreto, the

chief financial officer and a partner in Tecsis, met with Henning in Brazil and told Henning his company was interested in a relationship.

The next month, Barreto traveled to Miami with Bento Koike – chief executive officer, director, and majority owner of Tecsis – and again met with Henning. After describing his credentials and experience, Henning presented a "Blade Value Proposal." It included projections of the monetary benefits that his skill and knowledge could bring to the company. Because he did not know Tecsis's financial data, Henning's projections were estimates – illustrative only.

Tecsis initially offered Henning $1 million and 3% of pre-tax profits for information and advice about his former employer, GE. Henning asked for additional compensation and a longer relationship, seeking to establish a business rather than a project.

On August 30, 2005, Tecsis sent Henning the first draft of a proposed agreement. Although Brazilian, Koike and Barreto were fluent in English, and one of them wrote the initial draft of the contract – including the disputed language at section 2.2 – Tecsis has claimed cultural disharmony to justify its revision or avoidance of the text. In the draft, Tecsis offered Henning (a) $1 million in scheduled payments, and (b) a "variable payment of 3.33% of every gross benefit streaming from initiatives derived from the business relationship between the parties, regarding GE Wind Energy contracts, during... September 1st 2005 to December 31st 2007." Tecsis included an attachment – a slide from Henning's presentation in Miami – that equated "total gross benefits" with "total incremental profits."

Tecsis's books were private and even abstract figures were unavailable to Henning. Tecsis was not regulated. It was closely held and highly leveraged. For these reasons, Henning told Barreto not to tie his pay to profits but to gross revenues. He also told Barreto that he wanted compensation for Tecsis's intangible benefits – mentioning improved reputation – as well as tangible economic returns. Barreto agreed, and later that day Henning sent him a revised draft.

Henning's counter offer kept Tecsis's division of duties and compensation:

> (a) Under sections 1.1 and 2.1, Henning agreed to furnish Tecsis strategic information for $1 million over six months with $70,000 in interest;

> (b) Under sections 1.2 and 2.2, Henning agreed to advise Tecsis on its relationship with GE Wind Energy and other customers in exchange for "3.33% of every gross benefit streaming from initiatives derived from the business relationship between the Parties . . . during . . . September 1st 2005 to December 31st 2007." The goal was for Tecsis to contract with GE and other blade customers; and

> (c) Under sections 1.3 and 2.3, Henning agreed to establish and manage a service operation in the United States in exchange for "a salary and benefits . . . no more nor less than the equivalent range of total compensation afforded to Tecsis partners."

This revised draft no longer tied gross benefits to "total incremental profits." It also clarified that the numbers Henning used in his blade value proposal were not binding in the contract.

Only Henning, Koike, and Barreto negotiated the agreement. Tecsis accepted Henning's revised draft with only minor, non-material changes. The parties executed it on September 1, 2005. Koike, CEO, director, and majority owner of Tecsis, signed for Tecsis.

4.   *Information & Advice.*

As he promised, Henning supplied Tecsis critical background and other information relating to GE. He advised it through messages, calls, and meetings. He explained to Tecsis aspects of GE's operations and needs.

Henning advised Tecsis about marketing, logistics, materials, manufacturing, and finance. The data and recommendations he supplied were both general and detailed: invoices, molds, inventories, and products, communications, plant sites, and competitors. He also offered Tecsis business strategies and tactics for negotiating contracts, and he reviewed and commented on them.

Henning frequently furnished his strategic information through presentations and analyses, including:

- Analyses about GE blade needs, the capacity of other GE suppliers and competitors of Tecsis, the prices others charged, and suggested pricing strategies for Tecsis;

- Presentations entitled Blade Market Strategy, Blade Growth Strategies, A TECSIS 2005 Contributions to YTD – Providing the Best Value for GE, and A Tecsis Blade Storage Proposal.

As hoped, nearly seven months after the agreement between Henning and Tecsis, Tecsis secured a four-year contract with GE; this contract was more favorable than its earlier one with GE had been. Koike did not want GE to know that it had hired Henning – its former employee. Consequently, Henning advised Tecsis discretely, and he did not talk to GE directly.

Additional four-year contracts with Clipper Turbine Works, Inc., and Acciona Windpower SA followed. Henning directly consulted on the GE and Clipper contracts, and while he did not directly consult on the Acciona contract, his recommendations about the others were applicable to Tecsis's negotiations with Acciona. Without Henning, Tecsis likely would not have negotiated such highly favorable terms. Henning was the procuring cause. The next year, Tecsis was the GE Energy supplier of the year – a coveted award in the industry.

From 2006 through 2009, the GE, Clipper, and Acciona contracts generated more than $1.2 billion in revenue for Tecsis. The future revenue – beyond 2009 – from those contracts could generate $352.7 million to $770.1 million. Tecsis procured these contracts with Henning's help, and Henning's assistance is realized most distinctly in the initial years of those contractual relationships – immediately after his input.

After Henning joined Tecsis, its sales doubled. Henning began work in September of 2005. Tecsis's 2005 sales were BRL252 million – Brazilian Reals. The next year, sales rose to BRL494 million. Sales rose again to BRL649 million in 2007; BRL990 million in 2008, and were BRL787 million in 2009. Henning's help was a crucial component in this growth. Tecsis offered no alternative explanation with plausible specifics for its improved sales and profits. Along with the new contracts for blades, Henning re-organized Tecsis's sales, logistics, manufacturing, and service, founding its expanding success.

5. *WindCom.*

Henning began his third contractual task in early 2006: forming and managing the American subsidiary Wind Composite Services Group, LLC – called WindCom. It served Tecsis's American customers. Henning hired a former colleague from GE, Olen Richardson, for his technical work in blade servicing. Together, they named WindCom, created its logo, planned the strategy, projected finances, incorporated it, leased space, equipped the office,

opened bank accounts, bought insurance, opened its books, wired it to the web, hired and trained employees, and developed customers.

Through another wholly-owned subsidiary, Tecsis furnished the capital to begin WindCom, but it did not fully support it. Tecsis required WindCom to send the money it made to Tecsis. As a result, WindCom was, at times, unable to meet its own expenses. On these occasions Henning funded WindCom's operations himself. Tecsis also refused to send it support technicians when they were needed.

Despite the tepid support from Tecsis, WindCom succeeded. It generated $1.2 million in sales in 2006, $7 million in 2007, $23.6 million in 2008, and $28 million in 2009 – United States dollars. These sales resulted from work by Henning. Obviously pleased with Henning's results, Tecsis used WindCom as a model and opened a similar company in Europe which it also calls WindCom.

6. *Payment.*

For initial information, Tecsis agreed to pay Henning $1,070,000 according to this schedule: $100,000 plus interest on the fifth of September, October, November, December of 2005, and January of 2006 and $500,000 plus interest on February 5, 2006. Tecsis paid the first installment on time but paid the second through fourth months' payments late. Tecsis then refused to make payments for about fourteen months until in April of 2007 paying Henning $250,000 of the approximately $600,000 outstanding. Not until the summer of 2007 – over a year late – did Tecsis pay what it owed in full for the information.

For his consultation, Tecsis agreed to pay Henning not more than one year after the benefits were realized by Tecsis. It paid Henning nothing for consultation until the summer of 2007 – over a year after the GE contract had been executed. At the time of the payment in 2007, Tecsis did not give Henning data to verify the accuracy of the amount paid. Tecsis refused to furnish the data until this court compelled it, after it had evaded its responsibilities to disclose and to respond to discovery requests and repeated orders.

For managing WindCom, Tecsis promised to pay Henning as it paid its own partners. Although he was not paid consistently for managing WindCom, Tecsis paid him an average weekly salary of $4,807.69. His salary was paid by Tecsis – not WindCom.

To show its partners' salaries, Tecsis offered a summary table of names and numbers for some partners. The table omitted Koike, the largest partner. These data were clearly partial.

No supporting records – not even illustrative samples – were supplied by Tecsis. The table shows that other partners were paid $6,952.82 per week during the same time – including distributions, loans, and salary. The loans in lieu of salary was a middle-school level dodge. No partner has paid a cent in principal or interest. The loans were compensation, never intended to be repaid. An email between Tecsis and Henning suggests that Tecsis used "loans" to avoid taxes.

7.  *Requests for Payment.*

By at least April 3, 2007 – 19 months after signing the agreement – Henning began asking Tecsis to pay him. He e-mailed Koike that day with his estimate of the amount he was owed based on the incomplete information he had. Around that time, he also called Tecsis. In response, Tecsis sent him a partial payment of $250,000 on the past due amounts under the information clause.

Their talks continued throughout the summer, and in July of 2007, Luis Gil, who had become Tecsis's chief financial officer, came to Houston to meet Henning. He knew nothing of the contract between Henning and Tecsis from 2005. Gil testified that he had thought his job was to placate Henning. After Gil's visit, Tecsis paid Henning $1,460,000 – six months before the expiration of the contract. It was the minimum Henning had estimated that he was owed. Despite promises of candid disclosure, Tecsis never furnished him the data that he needed to calculate – not guess – what Tecsis owed him under the second and third parts of their contract – general consultation and management.

Tecsis's payment of $1,460,00 to Henning represented only the minimum amount Henning was owed. The amount was subject to Tecsis's promises to share its financial data to verify the amount it owed him. The issues arising out of their agreement of 2005 had not been concluded. Henning wanted the data, and he and Bento agreed that Henning would visit Brazil to discuss the continuing problems with Koike. One principal remaining issue was Henning's proposed solution: a new contract converting the unpaid portion of his contract into an equity interest in WindCom or Tecsis.

Tecsis argues that the payment of $1,460,000 was a full settlement. It was not. Gil could not have thought that he had discussed and resolved all the problems, debts, and obligations under the contract from 2005 when he did not know the document existed. No meeting of the minds could have occurred. Even though Gil advised Koike to memorialize the

outcome of his trip in writing, Koike did not generate a memorandum, internal or external. If the Houston session with Gil had resolved everything, Tecsis would have had no occasion to ask him to Sao Paulo for further negotiations – another sign that no settlement was reached.

In e-mails, Henning referred to the payment as a settlement, but he used the term to reflect the resolution of that aspect of the conflict over a long-term, multi-phasic contract. During the spring and summer of 2007, Tecsis did not generate a memorandum to define a single part of the meetings, payments, or talks that had occurred the previous two months. Tecsis has a chief financial officer and a general counsel. It does business in several countries, and should know to document events involving so much money. Despite Gil's recommendation and common sense, no signed papers exist to show a settlement of a claim made, much less all claims.

As he discussed with Gil, Henning traveled to Brazil in the middle of August 2007 to meet with Koike. Koike initially refused to see him, and when he finally did, he then refused to discuss the 2005 agreement or their future together. He became irate when Henning broached the topic of exchanging an ownership interest in return for the outstanding balances of the original agreement. The meeting was sufficiently counter-productive that Henning returned to Houston and resigned on August 31, 2007.

Because Henning knew the business, knew what he had accomplished, and knew Kioke's equivocation on all of Tecsis's commitments, he sued it on April 24, 2009. The total amount it had paid him under the three portions of the contract is $2,745,512.

8. *Competition with WindCom.*

Before Henning went to Brazil in April 2007, he formed a company called Wind Services Group, Inc., but he did nothing more until he had returned from his other trip to Brazil in August 2007. Between August 23 and August 31, 2007, Henning began preparing to compete with WindCom; he asked employees to work for Wind Services Group and told some customers that he would be doing the business under the name Wind Services rather than WindCom.

Tecsis says that by stealing WindCom's employees, customers, information, and files, Henning breached his promises to it to manage WindCom and to not work for Tecsis's competitors while simultaneously working for it. Tecsis has offered these assertions as its defense to paying Henning.

Throughout this case Tecsis has insisted indignantly that it is distinct from WindCom; that WindCom's presence in Houston cannot be attributed to Tecsis for jurisdictional purposes. Then, with no embarrassment, Tecsis seeks to defend its obligations to pay Henning by asserting injuries to WindCom. It says that it should get an offset for the damage done to WindCom by Henning's having organized a similar company, recruited some WindCom employees and customers, and closed WindCom's office.

If the companies were actually distinct, the damage belongs to WindCom rather than Tecsis. As with the organization, finances, and control of WindCom, Tecsis has not consistently enunciated a single position about its relationship with WindCom. Fatally, Tecsis has not disclosed normal business documents that support this claim. Tecsis's argument that Henning breached the contract between them by competing with WindCom reinforces this court's jurisdiction over Tecsis.

Tecsis had the same vague, evolving data for WindCom that it had for its direct operations. The data did not show that Henning's closing of WindCom and organizing of another service company were material to WindCom's continued prosperity. Tecsis did not show that it or WindCom suffered damages. By its refusal to pay Henning, Tecsis had already materially breached their agreement before he began Wind Services Group.

Despite WindCom's temporary closure after Henning's departure, Tecsis quickly reopened it and its success continues. In 2009 – after Henning had left – its revenues increased by $4.4 million – a 19% increase. Under Henning, WindCom went from no sales to $23.6 million in three years. WindCom suffered no harm from simultaneous competition from Henning; his actions were immaterial.

9.    Contract.

An enforceable contract must define its essential terms with sufficient particularity to allow a court to ascertain the reciprocal obligations.[1] The circumstances surrounding the

---

[1] 10A Tex. Jur. § 148 (rev. 1958). See T.O. Stanley Boot Co. v. Bank of El Paso, 847 S.W.2d 218, 221 (Tex. 1992); Stevens v. Palmour, 269 S.W. 1057, 1059. (Tex. App. – Waco 1925).

contract may aid in construing its terms.[2] When the amount owed is not explicit, a contract may, nonetheless, be sufficiently definite when the description of the payment is susceptible of proof.[3]

If one side has accepted the performance of the other, reason compels that both sides understood that they had an enforceable agreement. A party who wants to avoid a contract because it is impossibly confused should assert that conclusion before taking benefits under it.[4]

If terms are indefinite or uncertain, those flaws may be cured when a party performs. A contract that is so uncertain that it may not be specifically enforced in equity may nevertheless support a judgment at law in favor of a party who has performed.[5]

10.  *Enforceabilty Generally.*

The contract between Henning and Tecsis is enforceable. The parties clearly intended to bind themselves to a particular exchange. They had divergent interests, negotiated them, proposed a variety of terms, revised drafts, and signed a text of their agreement. After it was signed, Henning – with Tecsis's full knowledge, cooperation, and encouragement – performed his three duties under the contract: (a) he disclosed his information to Tecsis; (b) he advised Tecsis; and (c) he founded and managed its subsidiary, WindCom. He did all of this successfully with sincere enthusiasm. Tecsis did not pay him as it promised on any aspect of the contract and did not support the work he was doing. It did, however, take the benefits and kept them.

Tecsis stalled its performance. The prosperous if tortured life of this contract is full of Henning's asking for his pay, capital for WindCom, accounting records from Brazil, and

---

[2] 1 William G. Myer, *A Digest of the Texas Reports* § 124 at 278 (St. Louis, Gilbert 1881).

[3] *Mesa Petroleum Co. v. Coniglio*, 629 F.2d 1022, 1026 (5th Cir. 1980).

[4] *America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 623 (Tex. App. – San Antonio 1996, pet. denied).

[5] 10A Tex. Jur. § 154 (rev. 1958); *Meyers v. Price*, 247 S.W.2d 574, 579 (Tex. App. – Austin 1952); *Yerion v. Allison*, 242 S.W. 270, 272 (Tex. App. – Amarillo 1922).

technical staff for WindCom. Through all of this, Tecsis never disclaimed the contract. It never said the work was not important or done – never until it attacked Henning to avoid paying him years into his work.

Of the three tasks and corresponding payments, the dispute in the text's interpretation is the compensation for Henning's advice – Section 2.2. Secondarily, Tecsis disagrees with Henning's calculation of what he is owed for managing WindCom. Henning performed; Tecsis breached.

11. *Pay for Ideas.*

For his consultation, Section 2.2 says that Tecsis will pay him "a variable payment of 3.33% of every *gross benefit* streaming from initiatives derived from the business relationship between the Parties, regarding GE Wind Energy contracts but not limited to, during the time period of September 1st 2005 to December 31st 2007" (emphasis added). The sentence specifies (a) Henning's duties: consultation and advice; (b) the duration: from September 1, 2005, to December 31, 2007; and (c) a formula for calculating the compensation.

    A. *Benefit.*

"*Gross benefit*" has meaning. Being an abstract category, its precise content may vary by its context. English and the law are full of words with degrees of senses.

*Benefits* include the tangible and intangible returns to Tecsis. Henning and Tecsis chose the word *benefit* rather than *profit, revenue,* or *income* because they intended to compensate Henning for his contributions to Tecsis's intangible gains – goodwill, for example – that his work would bring the company. They chose this word purposefully.

Henning, however, only seeks payment for the tangible benefits from his contribution to Tecsis's success from the contract negotiations with blade customers. The tangible benefits are the GE, Clipper, and Acciona blade contracts Tecsis entered with the aid of Henning's information and advice.

Section 2.3.2 of the contract says the computation for Henning's compensation for intangible returns will be "general methodology agreed by both Parties." This does not apply to the calculation of the tangible benefits – Tecsis's blade contracts. No agreement in the future on "methodology" is needed to determine tangible benefits.

B.   *Revenue.*

When speaking of the tangible returns, Henning says that "gross benefits" means gross revenues. Tecsis says it means gross profits. Facially, either interpretation is plausible but revenues is significantly more likely than profits. In 2005, when Tecsis and Henning were negotiating his employment, Henning rejected an arrangement where his pay would be determined by Tecsis's profits. Tecsis then agreed to a text on paper that included gross benefits and deleted all reference to gross profits. Revenues and profits cannot be identical. The language and their conduct show that neither could have thought gross benefits was the equivalent of gross profits.

Ordinarily in a commercial setting, *gross* means an amount that excludes deductions. Henning was supplying his ability to Tecsis so it could get revenues – the first step. Henning did not want a fee for service. He required a fixed payment – the $1,000,000 for information – at the start of his employment as insurance against his being discarded once his work had begun to generate an income stream. Henning agreed to help Tecsis become more efficient than it had been, and his work might have been reflected in its profits, but Henning required *revenue* to be the index for his pay. He could have used an amount that varied by the fluctuations in the price of wheat, for example. Henning was willing to tie his pay to Tecsis's performance as long as the datum was easily obtainable and not manipulable. He wanted to avoid reports of low profits from things he could not verify, like taxes, insurance, interest, and depreciation – to name but a few.

The court need only determine the amount Henning is owed for the tangible contributions he made to the company: the blade contracts Tecsis entered into with GE, Acciona, and Clipper.

Although the amount to be owed is derivative, the contract is sufficiently definite. The language describing the obligation is susceptible to only one reasonable interpretation and the amount is susceptible of proof. The evidence that was required to illuminate the recesses of the text has been background information on the parties' negotiations, the industry, and operating information from the company. That the contract imposes a close reading or two does not make it unenforceable.

C.      *Origination.*

The phrase "*streaming* from initiatives *derived* from the business relationship between the Parties ... during the time period of September 1st 2005 to December 31st 2007" could refer to benefits realized between September 1, 2005, and December 31, 2007, or it could refer to benefits originated between those dates. The court adopts Henning's testimony that it means benefits – contracts – originated between the September 1, 2005, and December 31, 2007.

Further, the revenues of those blade contracts continue – "stream"– well past Henning's initial tenure with the company. The direct impact of Henning's aid in entering them may be stronger than his aid in maintaining them in the later years of Tecsis's relationship with its customers. The effect of Henning's information and advice decays with time because of changes in the customers, Tecsis, technology, and the market. For this reason, Henning's share of the "streaming" revenues will be limited to the first four years of the lives of the contracts: to the revenue received in the years 2006 – the first full calendar year Henning was employed – through 2010. The contracts were for four years, but the relationships were highly likely to last into extensions because, if for no other reason, Tecsis had made the molds for each company's blades.

D.      *Incremental.*

Henning says that he is entitled to 3.33% of Tecsis's revenues while he worked for it. Tecsis says he should receive 3.33% of the revenues above their level before Henning came to work.

While Henning's interpretation that he is entitled to a 3.33% share in all revenue generated by the blade contracts Tecsis entered into while he worked for it is reasonable, Tecsis's interpretation is more persuasive. When Tecsis hired him, its GE contract was near expiration, and Tecsis was motivated to hire Henning to get his help in its winning a new contract with GE, his former employer. Tecsis hoped, then, at minimum, to enter a new contract with GE – whether or not it generated more income than the expiring one. All revenues generated by that contract were predicated on Henning's assistance to Tecsis in its origination. Henning's concept is that he contracted for an over-ride on the deals made using his knowledge – just like a geologist would on one of his prospects.

On the other hand, Tecsis hoped to do more business that it had before hiring Henning. It may have been concerned about even getting a new contract, but it wanted better

and additional contracts. Impressed by Henning's presentation in Miami, it hired him to attain levels of growth like those that Henning had projected – these included aspects of business unrelated to GE. While Tecsis did want a new contract with GE, it also wanted additional business overall. Benefits derived from the relationship of Henning and Tecsis would then mean gross benefits above its gross revenue before Henning joined Tecsis.

The court finds the gross increase in the gross benefits is the measure for Henning's pay. This accounts for Henning's advice on logistics and other things that were not tied to a particular new customer. Also, if they had intended that the measure of his pay would be an over-ride on particular contracts, they would not have found it necessary to have included the language about benefits *derived* and *streaming* from the deal. Under the contract Henning is entitled to 3.33% of Tecsis's gross revenue above $82,366,835 – the amount it collected in 2005.

  E. *Performance & Law.*

While the court concludes that the contract sufficiently defines the reciprocal obligations, the contract would be enforceable even if that were not true because Henning performed his obligations completely. He did everything Tecsis asked, and he did it well. Tecsis is a stronger, better company because of Henning. Until it got what it wanted – blade contracts with GE and new customers, a more efficient company, and an American service company – it accepted and encouraged Henning's performance. The law will not allow Tecsis to argue now that the terms defining its compensation to Henning are too uncertain for it to pay.[6]

  F. *Owed for Advice.*

Tecsis should have paid Henning $37,413,388 for his consultation and advice.

12. *Partner's Share.*

For his work with WindCom, Tecsis agreed to pay Henning the way it paid its partners – not less than the lowest paid partner. It did not. It has refused to furnish reliable data, despite

---

[6]10A Tex. Jur. § 154 (rev. 1958); *Meyers v. Price*, 247 S.W.2d 574, 579 (Tex. App. – Austin 1952); *Yerion v. Allison*, 242 S.W. 270, 272 (Tex. App. – Amarillo 1922).

court orders, verifying its partners' income. Further, it has kept secret the pay of its majority shareholder – Koike. The table Tecsis produced shows that whether characterized as distributions, loans, or salary, the partners' direct receipts increased every year from 2005 to 2008. Despite claiming at trial that it could not afford to pay Henning, the receipts of the non-Koike partners increased 15% in 2006, 23% in 2007, and 39% in 2008 from 2005 levels.

Relying reluctantly on Tecsis's incomplete information and treating the loans that replaced salaries in Brazil as pay, the average weekly salaries of all partners except Koike in the time it employed Henning was $6,952.83. Henning worked for Tecsis for eighty weeks.

Tecsis should have paid Henning $556,226 for managing WindCom.

13. *Information.*

For information, Tecsis owed Henning $1,070,000. While Tecsis has paid this, it did so over a year after it was due.

14. *Conclusion.*

Henning entered this contract with a healthy caution. He understood that once Tecsis learned his insights into contracting with GE, it could discard him. Henning carefully, if not exactly clearly, structured a future with Tecsis that was more than a six-months consulting contract. Once Tecsis secured the business it needed for the immediate future, it nonetheless, attempted to discard Henning without fulfilling its end of the bargain.

Tecsis should have paid Henning $39,039,614. It has paid Henning $2,745,512. Tecsis owes him $36,294,102 under the contract. Interest and costs will be added. As the prevailing party, Henning is also entitled to attorney's fees.

Interests, costs, and fees will be handled as a post-judgment matter.

Signed on July 22, 2011, at Houston, Texas.

Lynn N. Hughes
United States District Judge